IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| TARIK HOOKS | : | No. 13-257 |
| | : | |

## MEMORANDUM

PRATTER, J.                                                                      AUGUST /7 , 2020

Defendant Tarik Hooks, proceeding *pro se*, moves for a reduction of his sentence under 18

U.S.C. § 3582(c)(1)(A)(i).[1]  The primary basis for the motion is the COVID-19 pandemic and

attendant conditions relating to the pandemic as they may affect this defendant, who contends he

suffers from asthma, sleep apnea, and diabetes. The Government disputes the merits of the motion.

For the reasons that follow, the Court denies the motion.

### BACKGROUND

### I.      Mr. Hooks' Criminal Conduct

Mr. Hooks pled guilty to having committed six bank robberies and attempting to commit

three additional robberies.  All of these crimes occurred between February 2, 2013 and February

21, 2013.  At the time of his guilty plea, Mr. Hooks admitted to having committed another bank

robbery on February 10, 2013, which, by agreement, factored into his sentencing calculation.  Each

robbery involved Mr. Hooks handing a note containing instructions to the bank teller such as "no

dye packs," "no bait money," and "no alarms" and demanding money.  Mr. Hooks did not display

---

[1]      Mr. Hooks also sent to the Court a letter requesting appointment of counsel to assist him with his
motion for a reduction in sentence. (Doc. No. 55).  The Court construes this letter as a motion for
appointment of counsel. Because Mr. Hooks is not afforded a constitutional or statutory right to counsel in
submitting this motion and because the Court is confident that it can make an informed decision based on
the medical records provided, the Court denies the motion for appointment of counsel.

any weapons during any of the attempted or completed robberies. In total, Mr. Hooks stole in excess of $24,000 during the robberies.

The Probation Office determined a Total Offense Level of 25 for Mr. Hooks and computed a Criminal History Category of V. These determinations resulted in an advisory guideline range of 100 to 125 months' imprisonment. Mr. Hooks had six prior adult convictions:

> (1) Theft by receiving stolen property in 1999, for which he received a sentence of three years' probation. Mr. Hooks violated this probation, and on March 11, 2002, was sentenced to serve 9 to 23 months' imprisonment. Mr. Hooks again violated the terms and conditions of his supervision, and on May 9, 2003, a new seven-year term of special probation was imposed.
>
> (2) Unauthorized use of an automobile in 2000, for which Mr. Hooks received a sentence of two years' probation.
>
> (3) Unauthorized use of an automobile in 2001, for which he received a sentence of two years' probation. Mr. Hooks violated this probation, and on November 26, 2002, he was sentenced to serve one to two years' imprisonment in a state correctional facility.
>
> (4) Access device fraud in 2001, for which he received a sentence of two years' probation in the Intermediate Punishment Program.
>
> (5) Firearm carried without a license/carrying firearms in Philadelphia in 2002, for which he received a sentence of 16 to 36 months' imprisonment, followed by a consecutive four-year period of special probation.
>
> (6) Criminal attempt to commit theft by deception in 2004, for which he received a sentence of 6 to 23 months' imprisonment.

Taking into consideration the sentencing factors pursuant to 18 U.S.C. § 3553(a), the Court sentenced Mr. Hooks to 115 months' imprisonment, to be followed by a three-year period of supervised release.

Mr. Hooks is serving his sentence at FCI Schuylkill with an anticipated release date of June 1, 2021. Mr. Hooks reports that he will be eligible for release to a halfway house on October 1, 2020, and the Bureau of Prisons (BOP) reports that his "Home Detention Eligibility Date" is

December 1, 2020.  Mr. Hooks has incurred two disciplinary infractions while serving his sentence, which include possession of a hazardous tool and giving/accepting money without authorization and phone abuse.

## II.    Mr. Hooks' Request for Compassionate Release and Medical Records

In April 2020, Mr. Hooks submitted a request for compassionate release to the warden at his facility.  His request was based on his assertion that he suffers from asthma, sleep apnea, and diabetes. Mr. Hooks' request was denied five days later.  In his motion for reduction in sentence, he again identified medical conditions including asthma, sleep apnea, and diabetes, but added a diagnosis of tuberculosis.

Mr. Hooks' medical records reveal that Mr. Hooks, who is 42 years old, presents asthma, sleep apnea, and prediabetes.  The medical records contain no mention of any diagnosis or treatment for tuberculosis.  At this time, all of Mr. Hooks' conditions appear to be well-controlled with medication provided by the medical personnel at FCI Schuylkill.  Concerning his asthma, there is no evidence that Mr. Hooks sought or received treatment while incarcerated for any acute asthmatic episode.  Moreover, his use of prescription drugs to manage his asthma has been moderate. He has been prescribed Albuterol, an inhaler which includes instructions that daily use of the medication is not necessary and that it should be used for two puffs by mouth four times a day as needed to prevent or relieve asthma attack.

Concerning his sleep apnea, the medical records demonstrate that Mr. Hooks was issued a Continuous Positive Airway Pressure (CPAP) machine in January 2019.  Mr. Hooks has not reported any issues with his sleep apnea since receiving the CPAP machine.

As for his prediabetes, Mr. Hooks received a 6.4 for his most recent A1C reading taken in April, placing him at the top of the range for prediabetes.  The BOP's medical personnel discussed

the elevated levels with Mr. Hooks in an effort to get him to participate in controlling them through dieting and exercise.  Mr. Hooks, however, has apparently exhibited a lack of cooperation as to these efforts.

Although not explicitly mentioned in his motion, Mr. Hooks also suffers from a Vitamin-D deficiency.  The medical records show that he has been prescribed Cholecalciferol (1.25 mg – once per week) in response to this condition, which has significantly improved Mr. Hooks' Vitamin-D levels.

### III.   Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority",[2] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012.  BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Aug. 7, 2020).   The protocol set forth in this plan established a phased framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i.  This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.  BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies.  In accordance with the Coronavirus (COVID-19) Action Plan, BOP

---

[2]     BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Aug. 7, 2020).

began to modify its operations to minimize the risk of COVID-19 transmissions on March 13, 2020.

Presently, BOP operations are governed by Phase Seven of the Action Plan. The current modified operations plan in this phase requires all inmates in every BOP institution to be secured in their assigned cells or quarters as a means to stop any spread of the disease. Only limited group gathering is permitted, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has also severely limited the movement of inmates and detainees among its facilities. Exceptions exist only for medical treatment and similar exigencies. Moreover, official staff travel has been cancelled, as has most staff training. BOP is also endeavoring to regularly issue face masks to all staff and inmates and strongly encourages individuals to wear appropriate face coverings when in public areas when social distancing cannot be achieved.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with sustained community transmission. Staff exhibiting a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members exhibiting a stuffy or runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may access BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer accessing BOP facilities will accordingly be screened for symptoms and risk factors. Legal visits

will be permitted on a case-by-case basis only after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3]  Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).  On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of coronavirus transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution.  BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety or prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Thus far, BOP's efforts at FCI Schuylkill have been mostly successful.  As of August 6, 2020, only one positive case of an inmate having COVID-19 has been reported, and no staff COVID-19 cases have been reported.[4]  That inmate has been isolated while receiving any necessary treatment.

---

[3]    This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

[4]    Through its website, BOP provides current information about COVID-19 cases reported at all of its facilities. *See* BOP, *COVID-19 Coronavirus*, available at https://www.bop.gov/coronavirus/ (last visited Aug. 7, 2020).

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[5]

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[6] and only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

---

[5]    Because the Court is satisfied that Mr. Hooks met the exhaustion requirement and because the Government does not raise an exhaustion argument, the Court will not focus its analysis further on this requirement.

[6]    Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the term. The application note provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.(1)(A)(ii). In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (Rambo, J.) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)).

## DISCUSSION

Before addressing the arguments and the evidence, it bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have

successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing",[7] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Hooks' motion still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Hook moves to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). His request is based on his assertion that his asthma, sleep apnea, diabetes, and tuberculosis diagnosis, accompanied by the existence of the COVID-19 pandemic, presents an extraordinary and compelling reason justifying his release.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune individual, does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and

---

[7]     Some have understandably suggested that this would be better thought of as "physical distancing", insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

professional efforts to curtail the virus's spread"); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within out Circuit.").

Although the Government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents a serious physical or medical condition that substantially diminishes the ability of a defendant to provide self-care within the environment of a correctional facility, the Government contends that Mr. Hooks presents no such condition.

Mr. Hooks' medical records reveal that he presents asthma, sleep apnea, and prediabetes and that all of these conditions are well-controlled with medication provided at FCI Schuylkill. The CDC recognizes that "moderate to severe asthma" *may* pose a risk of an adverse outcome of COVID-19.[8]   *See* CDC, *People with Moderate to Severe Asthma*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Aug. 7, 2020). Pursuant to the National Asthma Education and Prevention Program, an individual suffers from moderate persistent asthma if any of the following is true:

> Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
>
> Symptoms interfere with daily activities.
>
> Nighttime symptoms occur more than 1 time a week, but do not happen every day.
>
> Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

---

[8]   This is in contrast to a number of conditions that the CDC represents present a *definite* risk.

UNIVERSITY OF MICHIGAN, *Classification of Asthma*, available at https://www.uofmhealth.org/health-library/hw161158 (last visited Aug. 7, 2020).

Mr. Hooks' medical records reveal that his use of his inhaler is minimal and that he has not sought or received treatment while incarcerated for any acute asthmatic episode. The Court finds that there is an absence of documentation showing that he meets the definition described above for moderate asthma. Accordingly, Mr. Hooks' asthma does not present an extraordinary and compelling justification for his reduction in sentence. *See, e.g., United States v. Slone*, No. 16-400, 2020 WL 3542196, at *6 (E.D. Pa. June 30, 2020) ("[A]n incarcerated person arguing extraordinary and compelling reasons based on asthma which is not moderate to severe is not entitled to compassionate release."); *United States v. Towel*, No. 17-519, 2020 WL 2992528, at *5 (E.D. Pa. June 4, 2020) (determining that mild, exercise-induced asthma which is well-controlled by the facility is not a factor which increases the risk for severe illness due to COVID-19).

Moreover, the CDC has not identified sleep apnea as a factor which increases the risk of developing serious illness from COVID-19. *See United States v. James*, No. 15-255, 2020 WL 3567835, at *4 (D. Minn. July 1, 2020) (noting that sleep apnea is not a condition that the CDC has identified as specifically increasing the risk of developing serious illness from COVID-19). Although Mr. Hooks contends that he suffers from diabetes, his medical records reveal that his most recent A1C reading of 6.4 shows that he has prediabetes. Like sleep apnea, the CDC has not identified prediabetes as a COVID-19 risk factor. *See United States v. Hazam*, No. 18-30029, 2020 WL 3265349, at *2 (C.D. Ill. June 17, 2020) (noting that the CDC does not recognize prediabetes as a comorbidity that may increase the risk of serious injury or death from COVID-19); *United States v. Mungin*, No. 97-1105, 2020 WL 2847927, at *3 (S.D.N.Y. June 2, 2020)

(same).[9] The Court is confident that Mr. Hooks' medical conditions are appropriately managed at FCI Schuylkill, that the facility is engaged in strenuous efforts to protective inmates against the spread of COVID-19, and that it would act to treat any inmate who does contract COVID-19. Accordingly, Mr. Hooks has failed to present any extraordinary and compelling reason warranting his requested reduction in sentence. Even if Mr. Hooks had presented such a compelling justification warranting his reduction in sentence, the Court's consideration of the § 3553(a) factors and possible danger to the community imposed would also necessitate a denial of Mr. Hooks' motion. Mr. Hooks failed to demonstrate how his release would appropriately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A).

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Hooks' motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[9]     Although Mr. Hook does not cite his Vitamin-D deficiency in his motion as a factor justifying his reduction in sentence, the Court notes that the CDC also does not list such a deficiency as a risk factor for COVID-19. *See* CDC, *People at Increased Risk of Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html?CDC_ AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions %2Fpeople-at-higher-risk.html (last visited Aug. 7, 2020).